JOSEPH K. McENEANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McEneany v. Commissioner
Docket No. 3010-84.
United States Tax Court
T.C. Memo 1986-413; 1986 Tax Ct. Memo LEXIS 195; 52 T.C.M. (CCH) 366; T.C.M. (RIA) 86413; September 3, 1986. Duane D. Conover, for the petitioner. Michael Phalin *196 and James Kamman, for the respondent. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION BUCKLEY, Special Trial Judge: The proceedings in this case were conducted pursuant to section 7456(d)(3) of the Code, [1] and Rules 180, 181 and 182, Tax Court Rules of Practice and Procedure.[2]
In a statutory notice of deficiency dated November 10, 1983, respondent determined a deficiency in petitioner's 1982 Federal income tax of $2,255. The sole issue for decision is whether petitioner, who is under vows of poverty and obedience to an Order of Roman Catholic priests, may exclude from gross income amounts received from the State of California as compensation for his services as the Catholic Chaplain at a State hospital for the mentally disabled. FINDINGS OF FACT Some of the facts have been stipulated and are *197 so found. The stipulation of facts and exhibits thereto are incorporated herein by this reference. At the time he filed his petition in this case, as well as all other times relevant to this litigation, petitioner resided in Costa Mesa, California. Petitioner filed his 1982 Federal income tax return with the Internal Revenue Service Center at Fresno, California. Petitioner was issued a W-2 Wage and Tax Statement for the 1982 tax year showing "wages, tips, other compensation" of $27,336. His timely filed Federal income tax return for 1982 showed "wages, salaries, tips, etc.," of $0.00 and referred to an attached statement contending that all monies earned by him were not taxable to him because they were earned as an agent of a religious order. In arriving at the deficiency determination respondent allowed petitioner a charitable contributions deduction equal to 50 percent of his adjusted gross income. See sec. 170(b)(1). Petitioner was ordained a Roman Catholic priest in 1958. He is a member of the Congregation of the Sacred Hearts of Jesus and Mary (herein Order) of the Roman Catholic Church. He has been a member of the Order at all times relevant hereto. The Order is an *198 onganization exempt from tax under section 501(c)(3). As a member of the Order, petitioner is under vows of poverty and obedience. His vow of poverty dictates that any money earned by him or any other accession to wealth received by him is to be turned over to the Order. Because of his vow of obedience, petitioner must take any assignments and perform any duties given to him by his superiors in the Order. Fairview State Hospital (herein Fairview) is a hospital for the mentally disabled located in Costa Mesa, California, and operated by the California Department of Developmental Services. Fairview provides Catholic, Jewish and Protestant chaplains to minister to the spiritual needs of patients at the hospital. The patients (now popularly referred to as clients) at Fairview are developmentally disabled persons. In 1960, Fairview was in need of a priest to fill the Catholic chaplain position. Fairview requested the Roman Catholic Archdiocese of Los Angeles (herein Archdiocese) to provide a priest to fill the position and to minister to the spiritual needs of the patients. The Archdiocese, in turn, requested petitioner's Order to provide the Catholic Chaplain needed at Fairview *199 and Father McEneany was appointed to that position by the then provincial superior [3] of the Order. At the time the vacancy arose, petitioner had been assigned by his Order to go to Ireland to start a minor seminary. Two days before he was set to sail, he was informed by Rev. William J. Condin, ss.cc., who was the provincial superior of his Order at that time, that instead of going to Ireland, he was to report to Fairview and serve as the Catholic Chaplain. Petitioner, in accordance with his vow of obedience, went to Fairview as directed. Fairview State Hospital is a California state facility and all employees are subject to the employment process of the State civil service system which necessitates that payroll checks be issued directly to the person performing the services of the position. Direct payment by the State to the Catholic church, the Archdiocese or to the Order is not possible since the State is prohibited from contracting for services which can be provided through *200 the civil service system. There is a civil service classification of Catholic Chaplain. Fairview appointed petitioner Catholic Chaplain on October 1, 1960. In connection with this appointment he filed an application detailing his educational and work history, as well as a supplementary letter outlining more fully his clinical pastoral training. His appointment was approved by the State personnel board on November 1, 1960. Petitioner has remained the Catholic chaplain at Fairview up until the date of trial. Petitioner's compensation is set by the State. As a civil service appointee, he is a compulsory participant in the State Public Employee Retirement Systeem. [4] He is also a compulsory member of Fairview's employee bargaining unit. Petitioner, under his vow of poverty, has consistently negotiated his paychecks, which are received monthly, to the Order. Upon receipt of each paycheck, petitioner writes on the back of the check, "for deposit only to the Sacred Hearts Fathers." He then forwards the checks to *201 the Order's treasurer. At the same time he notifies the Order of how much money he needs to meet his living expenses. [5] The Order's treasurer then supplies the needed money. Through a letter stipulated to by both parties, Louis H. Britt, Personnel Officer at Fairview, in commenting on the manner in which petitioner handles his paychecks, states that, "[d]ue to his vow of poverty [petitioner], is not allowed the use of his payroll warrants. This has the effect of reimbursing the Church through his religious order (Sacred Hearts) for his duties." Petitioner's duties and responsibilities *202 at Fairview are solely the performance of the priestly duties of a Catholic chaplain. He has no secular duties whatsoever. Thus, he says mass every Sunday, as well as on other occasions. He hears confessions, gives communion, performs haptisms, assists at confirmations, and anoints the sick. He gives religious counsel to Fairview staff members, to families of patients and to those patients able to comprehend such counsel. When petitioner first came to Fairview in 1960, many patients were in the 60-80 IQ range and he was able to do much spiritual work with them. In later years, the nature of the patients changed so that most are severely retarded and require constant help and care. Many now are severely retarded and in need of constant care. Some are so ill that they are incapable of recognizing their own parents. He works with a Catholic lodge, the Knights of Columbus, many of whom volunteer at the hospital where they assist in wheeling patients to mass. There is no one in the State or the Fairview administration who supervises petitioner in his duties. He does report his presence when he is physically within the hospital so that the administration will know where he is, *203 but other than that he is not supervised in his role as chaplain. In this regard, petitioner testified: "They say, 'well, we can't tell you how to say mass, and how to give the sacraments, so we leave that all up to you.'" His functions at Fairview are all sacerdotal in nature. The only supervision or control of petitioner's activities lie in the hands of his religious hierarchy. Thus, the superior of his Order may reassign him at will. Further, the Bishop of Orange County, the Diocese in which Fairview is located, grants him his faculties, viz, his right to function as a priest within the diocese. Fairview provides petitioner with an office which he uses for counseling, for patients and their parents wanting to confer with him, and for confession. He maintains his religious records of Baptism, Holy Communion and Confirmation in the office. ULTIMATE FINDING OF FACT Petitioner was not at Fairview as an agent of the Order, and salary paid to him by the State was compensation to him for his services and includable in his gross income. OPINION Once again we consider the issue whether a petitioner's wages were paid to him in his individual capacity or as an agent for his Order. *204 Section 61 defines gross income as "income from whatever source derived," and subsection (a)(1) specifically includes compensation for services within this definition. Moreover, it is a fundamental principle of Federal income tax law that income is taxed to the person who earns it and any attempt by a taxpayer to shift the incidence of taxation, by anticipatorily assigning income earned in his individual capacity, will be ineffectual. Lucas v. Earl,281 U.S. 111 (1930). The fact that income is taxed to the person who earned it has come to be known as the first principle of Federal income taxation. Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949). It is, however, not always apparent as to who has earned a particular item of income. This case presents such an instance. Ten years before Lucas v. Earl,supra, was decided the Supreme Court held that *205 income earned by an agent on behalf of a separate and distinct principal is the income of the principal and not the agent -- provided that the agent, in accordance with his or her fiduciary duty, assigns or turns the income over to the principal. Maryland Casualty Co. v. United States,251 U.S. 342 (1920). In order to resolve the dispute now before us, we must determine whether the payments received by petitioner from the State of California, because of his services as the Catholic Chaplain at Fairview, were earned by him individually or as an agent of the Order. Should we determine that the payments were earned by petitioner in his individual capacity, they are income to him. The subsequent transfer of those payments will not relieve petitioner of Federal income tax liability, as the transfer would be nothing more than an assignment of income. Lucas v. Earl,supra.If on the other hand we determine that the payments were received by petitioner in his capacity as an agent of the Order, they would not be taxable income to him, but rather to the Order. [6] Cf. McGahen v. Commissioner,76 T.C. 468, 478-479 (1981), affd. without *206 published opinion 720 F.2d 664 (3d Cir. 1983). It is clear that in 1982 petitioner received payments totaling $27,336 from the State of California. Our only concern here is the capacity in which petitioner received those payments--whether as an individual or as an agent of the Order. We must determine who is the proper taxpayer, and the "choice of the proper taxpayer revolves around the question of which person or entity * * * controls the earning of the income." Vnuk v. Commissioner,621 F.2d 1318, 1320 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; Johnson v. United States,698 F.2d 372, 374 (9th Cir, 1982); Vercio v. Commissioner,73 T.C. 1246 (1980). We have recently held that a Catholic nun, who worked as a nurse-midwife for an agency of the Federal Government that assigns health care professionals to work in areas lacking adequate *207 health care facilities, must pay Federal income taxes on compensation received for her services despite the fact that she faithfully turned over her paychecks to her Order pursuant to a vow of poverty. Schuster v. Commissioner,84 T.C. 764 (1985), appeal pending (7th Cir., July 23, 1985). The facts in Schuster, although not identical, are similar to the facts presented here and because of this a similar analysis must be undertaken. As in Schuster,supra at 773: The instant case is unlike many of the so-called "vow of poverty" cases decided recently by this Court in that [petitioner] at all times acted strictly in accordance with [his] vows of poverty and obedience, and at no time after endorsing the checks did [he] exercise any sort of control over the funds. Petitioner is part of a long tradition that is respected in our society, and these private arrangements with [his] Order arise from deeply held convictions. The fact that we feel [his] life is a sincere and worthwhile example should not, however, alter the tax results. In the final analysis, apart from petitioner's vow of poverty arising from [his] personal religious *208 convictions and way of life, this case is not different from any other assignment of income case. [Fn. ref. omitted.] In determining whether petitioner received the payments from the State of California in his individual capacity or as an agent of the Order, we must look beyond the private agreements between petitioner and the Order. Instead, we must inquire into whether petitioner performed his services as an employee of the State of California or whether the State contracted to receive the services from the Order, with petitioner performing the service on behalf of the Order, as its agent. See Schuster v. Commissioner,supra at 775. Therefore, we are required to determine whether the Order is under a legal duty or obligation to provide the services performed by petitioner, or to ensure that they be performed. In the absence of any legal obligation, the Order is nothing more than an "irrelevant bystander" and the petitioner cannot be acting on behalf of or as the agent of the Order. Schuster v. Commissioner,supra at 774. As we stated in Schuster v. Commissioner,supra at 774-775: This analysis implicitly *209 underlies the Supreme Court's decision in Maryland Casualty Co. v. United States,supra. In that case, the agent did not escape taxation because he was obliged to transmit the funds to his principal, nor did he escape taxation because his principal approved of his conduct. Rather, the Supreme Court reached its conclusion because "payment of the premium to the agent discharged the obligation of the insured and called into effect the obligation of the insurer as fully as payment to the treasurer of the claimant could have done." Maryland Casualty Co. v. United States,supra at 347. The premiums were the consideration for the risk underwritten by the insurance company, and payment to the agent was made to satisfy the obligation to pay the insurer. It was for this reason that the Court held that the principal, and not the agent, should be taxed. Thus, the notion established in Maryland Casualty Co., that an agent should not be taxed on amounts it receives as its principal's legal representative, depends upon the existence of some form of legal *210 relationship between the principal and a third party. This Court and other courts have consistently required such a relationship. E.g. Johnson v. United States,698 F.2d 372 (9th Cir. 1982); Johnson v. Commissioner,78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); Pacella v. Commissioner,78 T.C. 604, 619 (1982); Keller v. Commissioner,77 T.C. 1014, 1027 (1981), affd. 723 F.2d 58 (10th Cir. 1983). In Johnson v. Commissioner,supra at 891, we stated that "there must exist between the corporation [the 'principal'] and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position." The record makes clear that there was no contract between petitioner's Order and the State of California. Fairview, the employing State agency, had absolutely no contact with the Order. Fairview made its initial request for a priest with the Archdiocese, which in turn went to petitioner's Order. However, even had Fairview made its request to the Order directly, our conclusion would *211 be no different. Neither the Order nor the Archdiocese had any legal obligation to provide the requested religious services to Fairview. We also note, however, that Fairview appeared to have little, if any, input into the choice of the Chaplain, that apparently being the province of the Order. [7] In fact the record contains positive proof that no contract or obligatory relationship existed between the Order and Fairview. [8]
The only legal relationship created under the facts of this case is that of employer/employee between Fairview *212 and petitioner. If Fairview were unhappy with petitioner's services, he could have been released with no liability to the Order. On the other hand, had the Order seen fit to reassign petitioner to some other position, there is no indication that the Order would be obligated to supply another priest or would be liable to Fairview in any way. There is one factual difference between this case and Schuster which makes this case appear, at the first glance, more troublesome. This difference lies in the nature of the services performed by the respective parties. In Schuster, the taxpayer was performing duties which might be termed secular (nursemidwife) while in this case petitioner performed no secular duties at all and served only as a priest. This difference, however, does not alter the fact that petitioner's Order was under no obligation to Fairview or vice versa. The State of California pays petitioner in satisfaction of its legal obligation to him as an employee. The Order is not involved at all, except as the recipient of petitioner's earnings when he endorses his checks over to the Order. See Schuster v. Commissioner,supra at 777-778. The *213 Court of Appeals, in Fogarty v. United States,780 F.2d 1005 (Fed. Cir. 1986), has recently held that income received by Father Fogarty, a member of the Society of Jesus, as an associate professor at the University of Virginia, was earned in his individual capacity and not as an agent of his order. Fogarty, as petitioner herein, was bound to his order by vows of chastity, poverty and obedience. Teaching is an essential and traditional mission for the Jesuits. In affirming the decision of the Claims Court, the Federal Circuit agreed that the University looked to Father Fogarty, rather than his order, for the accomplishment of the services for which it bargained. The court stated that the relevant considerations will include the degree of control exercised by the order over the member, purposes or mission of the order, type of work performed by the member vis-a-vis those purposes or mission, dealings between the member and the employer and dealings between the employer and the order. The Federal Circuit, in holding for respondent, nevertheless recognized that the case was very close. It may well be that the instant case is even closer. We recognize that Fairview *214 made the overture to the Archdiocese to supply the Catholic Chaplain and they took the priest sent to them by the Order. Nevertheless, we fail to find the contractual relationship between the Order and Fairview herein. As in Schuster, petitioner earned his salary in his individual capacity and not as the Order's agent. The Ninth Circuit in Johnson v. United States,698 F.2d 372 (9th Cir. 1982), considered a professional basketball player who conveyed the exclusive rights to his services to a Panamanian corporation, but who played under contracts negotiated and executed by him with National Basketball Association teams. He then assigned the contracts to the corporation and contended that amounts received by the corporation did not constitute income to him as a "loaned out" employee. In rejecting Johnson's position, the Ninth Circuit made a two-pronged inquiry: (1) did the corporation have the right to control the activities of the individual and the amount of compensation the individual receives for those services and (2) whether this control has been recognized and accepted by the contracting party. If we apply this two-part test to the case at bar, it *215 appears that petitioner might satisfy the first test but there is nothing to indicate that the second test is met. Fairview looks to petitioner, not to the Order, for the performance of his services. See also Hogan v. United States, an unreported case ( Me. 1985, 57 AFTR 2d 86-338, 85-2 USTC par. 9846). We have no doubt of the sincerity of Father McEneany's arguments nor of his faithful performance of his priestly duties at Fairview. We conclude that this is a close case which we hold controlled by our decision in Schuster.
Decision will be entered for the respondent.
Footnotes
1. Section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. This case was originally filed as a small tax case as provided for in section 7463. On November 1, 1984, counsel for both parties moved the Court to remove this case from the small case category and by order the Court granted the joint motion.↩
3. The provincial superior of the Order is the head of an ecclesiastical province; the presiding member of a religious order in a province. The Random House College Dictionary 1065 (rev. ed. 1982).↩
4. Petitioner did testify that upon his retirement from Fairview, his vow of poverty would require that he turn over any State retirement benefits to the Order.↩
5. Regarding these expenses, petitioner testified as follows, "I need money for my car and other things, and my food, and then [the treasurer] sends the money back to me, whatever I need, whether it's $300 a month, or $400 sometimes a month." Petitioner testified that from 1960 to 1977 he lived on the hospital grounds. In 1977, the house in which he was living was needed for hospital use and petitioner was forced to make different living arrangements. With the permission of the Order, petitioner took up residence in a "private house about three or four minutes from the hospital."↩
6. Since the Order is an organization exempt from tax, the income would escape all Federal income tax if we determine that petitioner received it as the Order's agent.↩
7. Petitioner did file an application and was required after he had entered on duty by the State to elaborate on his pastoral training apparently to ensure he met the State civil service standards for Catholic Chaplain. ↩
8. Exhibit 4-D, which is a letter by Louis Britt, who is the Personnel Officer at Fairview, states: Fr. McEneany is paid through the State payroll system rather than direct payment to the Church or religious order since the State is prohibited from contracting for services that can be provided through the Civil Service system,↩ which again in this case would be through the Civil Service classification of Catholic Chaplain.